## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re: | Chapter 11 |
| Reading Eagle Company[1], | Case No. 19-11728-REF |
| Debtor. | (Joint Administration Requested) |
| In re: | Chapter 11 |
| WEEU Broadcasting Company[2], | Case No. 19-11731-REF |
| Debtor. | (Joint Administration Requested) |

## DEBTORS' MOTION FOR ORDERS (A)(I) AUTHORIZING AND APPROVING BIDDING PROCEDURES; (II) APPROVING NOTICE PROCEDURES; (III) SCHEDULING AN AUCTION AND SALE APPROVAL HEARING; AND (IV) APPROVING PROCEDURES FOR ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND DETERMINING CURE AMOUNTS AND (B)(I) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL CLAIMS, LIENS, RIGHTS, INTERESTS, AND ENCUMBRANCES; (II) APPROVING THE SUCCESSFUL BIDDER APA; AND (III) AUTHORIZING THE DEBTORS TO ASSUME AND ASSIGN CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Reading Eagle Company ("Reading Eagle Company") and WEEU Broadcasting Company ("WEEU," and together with Reading Eagle Company, the "Debtors"), hereby move this Court (this "Motion") for the entry of an order (the "Bidding Procedures Order"), in the form attached hereto as **Exhibit A**, pursuant to sections 105(a), 363, 365, 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6003, 6004, 6006, 9007, 9008 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 6004-1 and 9014-3 of the Local Rules of

---

[1] The last four digits of Debtor Reading Eagle Company's tax identification number are 3740.
[2] The last four digits of Debtor WEEU Broadcasting Company's tax identification number are 8488.

Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Eastern District of Pennsylvania (the "Local Rules"), (A)(i) authorizing and approving certain bidding procedures substantially in the form of Exhibit 1 to the Bidding Procedures Order (the "Bidding Procedures") in connection with the Debtors' sale (the "Sale") of substantially all of their assets (the "Purchased Assets"); (ii) approving the form and manner of notice of the Sale of the Purchased Assets; (iii) scheduling an auction (the "Auction") and hearing (the "Sale Approval Hearing") to consider approval of the Sale; and (iv) approving certain procedures for assumption and assignment of executory contracts and unexpired leases (the "Executory Contracts and Leases") and for determining cure amounts with respect to such Executory Contracts and Leases, and (B)(i) authorizing the Sale of the Purchased Assets free and clear of any and all claims, liens, rights, interests, and encumbrances (other than Permitted Encumbrances) to the party submitting the highest or otherwise best offer pursuant to the Bidding Procedures (in either case, the "Successful Bidder"); (ii) approving the asset purchase agreement entered into with the Successful Bidder in accordance with the Bidding Procedures (the "Successful Bidder APA"); and (iii) authorizing the Debtors to assume and assign certain Executory Contracts and Leases.  In support of this Motion, the Debtors rely on the *Declaration of Peter Barbey in Support of  Debtors' Motion for Orders (A)(I) Authorizing and Approving Bidding Procedures; (II) Approving Notice Procedures; (III) Scheduling an Auction and Sale Approval Hearing; and (IV) Approving Procedures for Assumption and Assignment of Executory Contracts and Unexpired Leases and Determining Cure Amounts and (B)(I) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of All Claims, Liens, Rights, Interests, and*

2

*Encumbrances; (II) Approving the Successful Bidder APA; and (III) Authorizing the Debtors to Assume and Assign Certain Executory Contracts and Unexpired Leases* (the "<u>Barbey Declaration</u>") which was filed concurrently herewith, and respectfully represent as follows:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157.  This is a core proceeding pursuant to 28 U.S.C. § 157(b), and the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief requested herein are sections 105(a), 363, 365, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6003, 6004, 6006, 9007, 9008 and 9014, and Local Rules 6004-1 and 9014-3.

## BACKGROUND

### A.      General Background

3.      On the date hereof (the "<u>Petition Date</u>"), the Debtors commenced their voluntary cases under chapter 11 of the Bankruptcy Code (the "<u>Chapter 11 Cases</u>"). Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors are continuing to manage their financial affairs as Debtors in possession.

4.      No trustee, examiner, or official committee of unsecured creditors has been appointed in the Chapter 11 Cases.

03/21/2019 SL1 1577122v14 006370.02031

5.      Information regarding the Debtors' history and business operations, capital structure and primary secured indebtedness, and the events leading up to the commencement of these Chapter 11 Cases can be found in the *Declaration of Shawn Moliatu in Support of Debtors' First-Day Motions* (the "First Day Declaration")[3].

**B.      Background Related to the Debtors' Business and the Sale Process**

6.      Debtor Reading Eagle Company is the leading local news source in southeastern Pennsylvania's Berks County. It publishes the Reading Eagle newspaper (the "Reading Eagle") and a companion website. It also has a print division (REC), a promotions division (Pretzel City Productions), and publishes South Schuylkill News, a weekly paper serving the South Schuylkill County region.

7.      Debtor WEEU Broadcasting is a wholly-owned subsidiary of Debtor Reading Eagle Company which operates the WEEU radio station.

8.      The Reading Eagle Company was founded in 1868 by Jessie G. Hawley and his father-in-law's cousin, William S. Ritter. They published the Reading Eagle together until ending their partnership ended in 1874. Hawley remained sole publisher of the Reading Eagle until his death in 1903. The Reading Eagle has remained in this same family for generations since.

9.      Since August, 2011 when he first joined the company, Peter Barbey has served as the President and Chief Executive Officer of Reading Eagle Company. He is Jessie Hawley's great-great-grandson. Barbey and his predecessors have consistently

---

[3] Mr. Moliatu is the Chief Financial Officer of the Debtors. Mr. Moliatu has very recently expressed interest in forming a group of investors to make a bid for the assets of the Debtors. In order to avoid any actual or perceived conflict, Mr. Moliatu will not participate in the sale process during these bankruptcy proceedings other than as a bidder unless and until he confirms that he no longer intends to participate in any bid. Mr. Moliatu did participate prior to the Petition Date in providing information to interested parties. However, at the time he did so, Mr. Moliatu had not yet assembled an investor group and, as of the Petition Date, has only had preliminary conversations with potential investors.

03/21/2019 SL1 1577122v14 006370.02031

invested in the company and Berks County, knitting the newspaper into the community for 150 years. Mr. Barbey also owns approximately 15.64% of the stock of Reading Eagle Company, with the remainder of the stock being owned by members of the extended family.

10.     The Reading Eagle is published daily, with average circulation of 37,178 Monday through Friday and 51,180 on Sunday. Its circulation revenue trends in recent years have beaten industry averages – a result of hands-on management, exceptional customer service and a strong local franchise. Its companion website, ReadingEagle.com, averages nearly 600,000 unique users and 3.2 million pageviews a month and traffic is growing steadily. South Schuylkill News distributes weekly to nearly 2800 households in and around South Schuylkill County.

11.     WEEU is a news/talk station that broadcasts at 830 kHz on the AM band with 20,000 watts of power daytime and 6,000 watts of power during nighttime. WEEU offers news, talk, sports and weekend music programming to a market of 400,000 plus people in and directly around Berks County. Programming includes specialty programs like scholastic sports broadcasts; Penn State football, Philadelphia Phillies, Eagles and 76ers broadcasts; and an interactive call-in talk show.

12.     In 2009, the Reading Eagle Company took on substantial debt to complete a significant expansion to its downtown presence with the opening of a 77,000-square-foot addition to its headquarters at 345 Penn Street, Reading Pennsylvania. The facility was built to house a new press and consolidated distribution center.

13.     In 2011 the primary secured lender to the Debtors, Santander Bank, entered into a forbearance agreement with the Debtors. Concurrently, Peter Barbey was appointed

5

interim President and Chief Executive Officer. Mr. Barbey was permanently appointed President and Chief Executive Officer in 2012.

14.     As of the Petition Date, Reading Eagle Company and WEEU Broadcasting Company had a total of 236 full-time and 20 part-time employees.

15.     Unfortunately, despite its proud history and unquestioned continued relevance to the Berks County community, the Reading Eagle has not been immune to the difficult trends facing the print newspaper industry, such as the loss of advertising revenue and loss of subscriptions.

16.     The rapid loss of advertising revenue has, in turn, led to deterioration in earnings before interest, taxes, depreciation and amortization ("EBITDA"), a common benchmark for performance of a business, including media businesses like the Reading Eagle Company.

17.     The Debtors' last year of positive EBITDA was in 2015 when newspaper advertising revenue was almost $17,800,000.  Unfortunately, in just the past two years this revenue has declined precipitously from almost $17,000,000 in 2016 to about $12,600,000 in 2018.

18.     In 2016, Reading Eagle Company generated EBITDA of about negative $916,000 on sales of about $35,200,000. In 2017, the Reading Eagle Company generated EBITDA of about negative $3,340,000 on sales of about 31,700,000. And in 2018 the Reading Eagle Company generated EBITDA of about negative $4,000,000 on sales of about $28,200,000.

19.     As a result of their financial issues, in 2009 the Debtors defaulted on their loan (the "Santander Loan") from Santander Bank, N.A. ("Santander"). The Santander

03/21/2019 SL1 1577122v14 006370.02031

Loan was secured by substantially all of the assets of the Debtors. At the time of the default the Debtors owed Santander approximately $25,000,000 plus certain swap exposure.

20.     BWH Media, LLC ("BWH Media") is a wholly owned subsidiary of Black Walnut Holdings, LLC. The sole member of Black Walnut Holdings, LLC is US Trust Company, as directed trustee of the Edwin Q. Barbey Children's Trust FBO Peter Barbey (the "Barbey Trust").

21.     In 2016, Peter Barbey caused BWH Media to acquire the Santander Loan from Santander.

22.     Since the acquisition of the Santander Loan by BWH Media, the Debtors have continued to operate at a significant cash flow loss. In order to keep the Debtors in operation, Mr. Barbey has caused Black Walnut Holdings, LLC to provide numerous additional loans (the "Additional BWH Loans") averaging about $250,000 per month.

23.     Subsequent to the acquisition by BWH Media of the Santander Loan, the Debtors undertook a number of initiatives intended to stabilize the business and position it for the future as a stand-alone community media company.  To this point in time, despite substantial cost savings measures, including newsroom layoffs, the Debtors' increased costs (such as for newsprint) and the company's fixed costs have outpaced cost cutting measures while overall revenue declines. The only large pool of costs available to cut are now in the newsroom, which cannot bear millions of dollars of cuts. Unfortunately, it has now become apparent to the Debtors and Mr. Barbey that, despite their best efforts, the Debtors are no longer a sustainable stand-alone business.

03/21/2019 SL1 1577122v14 006370.02031

24.    To preserve going-concern value and enable the Debtors to continue to serve the Berks County community, for about the last year, the Debtors have been exploring their strategic alternatives.    As part of that effort, Mr. Barbey personally contacted entities active in the media industry.

25.     In addition, on December 4, 2018, the Debtors engaged Dirks, Van Essen, Murray & April ("Dirks") to solicit interest from third parties with respect to a possible merger, consolidation, tender or exchange offer, or sale or exclusive license of all or a majority of the Debtor's assets or outstanding equity interests.

26.    Dirks drafted marketing materials and contacted potentially interested parties as detailed below (the "Prepetition Marketing Process"). In consultation with the Debtors' management, Dirks prepared an information memorandum summarizing the Debtors' business and the opportunity presented as well as financial and other information. Based on prior industry relationships and additional research, Dirks compiled a list of potential strategic and media-focused financial buyers who might be interested in investing in or acquiring the Debtors. The Debtors also built a comprehensive online data room to facilitate due diligence requests from potential investors or buyers.

27.    Dirks contacted 23 potential investors or purchasers and distributed the information memorandum to 13, all of which executed non-disclosure agreements. The parties that executed non-disclosure agreements were provided access to a confidential data room established by Dirks and four of them conducted interviews with the Debtors' management (collectively, "Diligence Information"). The Diligence Information provided prospective investors or buyers with detailed information on, among other topics, the

03/21/2019 SL1 1577122v14 006370.02031

Debtors' business, strategy, growth opportunities, technology, legal and regulatory matters, and historical and projected financial performance.

28.     As the Prepetition Marketing Process continued, a process letter was sent to one party establishing a bid deadline of March 14, 2019. One letter of intent was received by the deadline but the offer reflected in that letter of intent was not acceptable. As a result, Dirks continues to look for and engage with parties to explore possible transactions.

29.     The timeline and specific dates proposed herein will provide the Debtors sufficient time to expose their business and assets again to bidders, conduct an auction if any qualified bids are presented, and bring before the Court for approval the Sale to the Successful Bidder, and will permit the Sale to close consistent with the liquidity available to the Debtors. If the timeline proposed in this Motion is not approved, or if there are material delays in that timeline, the Debtors will run out of cash, will be unable to continue operations, and therefore may be unable to satisfy the conditions to the closing of an asset purchase agreement executed by a winning bidder.

## **RELIEF REQUESTED**

30.     By this Motion, the Debtors seek entry of an order, pursuant to sections 105(a), 363, 365, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 6004 and 6006, and Local Rules 6004-1 and 9014-3: (a) authorizing and approving the Bidding Procedures attached to the Bidding Procedures Order as Exhibit 1,; (b) approving the form and manner of notice of the Sale of the Purchased Assets (the "Sale Notice"), substantially in the form attached as Exhibit 2 to the Bidding Procedures Order; (c) establishing May 15, 2019 at 5:00 p.m. (Prevailing Eastern Time) as the deadline for the submission of Qualified Bids (the "Bid Deadline") and scheduling (i) the Auction, if necessary, for May

17, 2019 at 10:00 a.m. (Prevailing Eastern Time) and (ii) the Sale Approval Hearing no later than May 24, 2019; and (d) approving certain procedures (the "Assumption Procedures") for the assumption and assignment of the Debtors' Executory Contracts and Leases, including the form and manner of notice of assumption and assignment and related cure amounts (the "Assumption and Assignment Notice"), substantially in the form attached as Exhibit 3 to the Bidding Procedures Order.

31.     The Debtors further request that the Court enter an order at the Sale Approval Hearing, in the form attached hereto as **Exhibit B** (the "Sale Approval Order"): (a) authorizing the Sale of the Purchased Assets, free and clear of any and all claims, liens, rights, interests, and encumbrances (other than Permitted Encumbrances) to the Successful Bidder; (b) approving the Successful Bidder APA and (c) authorizing the Debtors to assume and assign the Executory Contracts and Leases that are designated to be assumed by the Debtors pursuant to section 365(b) of the Bankruptcy Code and assigned to the Successful Bidder pursuant to section 365(f) of the Bankruptcy Code (collectively, the "Assigned Contracts") in connection with the Sale of the Purchased Assets.

**A.     The Proposed Sale to the Successful Bidder**

32.     The following is a summary of the anticipated material provisions of the Successful Bidder APA:[4]

---

[4] The brief description of the Successful Bidder APA is for the convenience of the Court and parties in interest.  In the event of any inconsistency or ambiguity between the terms of the Successful Bidder APA and the Motion, the Successful Bidder APA shall control.

03/21/2019 SL1 1577122v14 006370.02031

| Term | Description |
|------|-------------|
| **Seller** | The Debtors<br><br>(*see* introductory paragraph of form asset purchase agreement, the "Form APA", attached hereto as **Exhibit C** ) |
| **Purchase Price** | The Purchase Price is composed of the following:<br><br>a) Cash, *plus*<br>b) assumption of the Assumed Liabilities, *plus*<br>c) the Closing Net Working Capital Amount (as determined in accordance with Section 3.3 of the Form APA), *plus*<br>d) the Cure Amounts<br><br>(*see* § 3.1 of Form APA) |
| **Purchased Assets** | All of the Debtors' properties and assets of every kind and description, wherever located, whether real, personal or mixed, tangible or intangible, owned, leased, licensed, used or held for use in or relating to the Business, other than the Excluded Assets.<br><br>(*see* Defined Terms and § 2.1 of Form APA) |
| **Excluded Assets** | *See* § 2.1(b) of Form APA |
| **Assumption and Assignment of Contracts and Leases** | At least twenty (20) days prior to the Sale Approval Hearing, each prospective buyer must provide Debtors with a completed form of Schedule 2.3.1.  Schedule 2.3.1 will list all contracts of Debtors that such buyer shall have designated for assumption by a Debtor and assignment to such buyer at Closing.<br><br>Prior to conclusion of the Sale Hearing, the Successful Bidder and Backup Bidder shall each have the right, in its sole discretion, to delete contracts from Schedule 2.3.1.<br><br>(*see* §§ 2.1, 2.3 of Form APA; Bidding Procedures Order) |
| **Assumed Liabilities** | All Liabilities (a) accruing on or after the Closing Date under any Assigned Contract required to be performed after the Closing Date, (b) on account of prepaid subscription and advertising obligations as of the Closing Date, (c) on account of accrued paid time off owed by the Debtors to Transferred Employees as of the Closing Date, and (d) |

11

| Term | Description |
|------|-------------|
|  | otherwise enumerated in Section 3.2.1of the Form APA. (*see* Defined Terms and § 3.2.1 of Form APA) |

### B.   Bidding Procedures

33.      The Bidding Procedures are designed to maximize value for the Debtors' estates and will enable the Debtors to review, analyze, and compare all bids received to determine which bid is in the best interests of the Debtors' estates and creditors.   The Bidding Procedures describe, among other things, the procedures for parties to access due diligence, the manner in which bidders and bids become "qualified," the procedure for receipt of bids, the conduct of any auction, the selection and approval of any ultimately successful bidders, and the deadlines with respect to the foregoing Bidding Procedures and sale process which are set forth in the chart attached as Exhibit 2 to the proposed Bidding Procedures Order.   The Debtors submit that the Bidding Procedures will enable them to conduct a sale process that will maximize the value of their estates.   Importantly, the Bidding Procedures recognize the Debtors' fiduciary obligations to maximize sale value, and, as such, do not impair the Debtors' ability to consider all qualified bid proposals and preserve the Debtors' right to modify the Bidding Procedures as necessary or appropriate to maximize value for their estates.

34.      The Bidding Procedures contain the following provisions, which are more fully described in the Bidding Procedures and the proposed Bidding Procedures Order:[5]

---

[5] The brief description of the Bidding Procedures contained herein is for the convenience of the Court and parties in interest.   In the event of any inconsistency or ambiguity between the terms of the Bidding Procedures and the Motion, the Bidding Procedures shall control.   Capitalized terms used in this paragraph but not otherwise defined shall have the meanings ascribed to them in the Bidding Procedures and Bidding Procedures Order, as applicable.

12

**Access to Diligence Materials**.   To participate in the bidding process and to receive access to due diligence (the "Diligence Materials"), a party must submit to the Debtors an executed confidentiality agreement in the form and substance satisfactory to the Debtors and evidence demonstrating the party's financial capability to close a transaction involving some or all of the Purchased Assets (a "Transaction") as determined by the Debtors.  A party who qualifies for access to Diligence Materials shall be a "Preliminary Interested Investor."  All due diligence requests must be directed to the Debtors' investment banker, Dirks, Van Essen, Murray and April, Attn: Sara April, 119 E. Marcy Street, Suite 100 Santa Fe, NM 87501, Tel. 505.820.2700, sara@dirksvanessen.com.   For any Preliminary Interested Investor who is a competitor of the Debtors or is affiliated with any competitor of the Debtors, the Debtors reserve the right to withhold any Diligence Materials that the Debtors, in their sole discretion, determine are business-sensitive or otherwise not appropriate for disclosure to such Preliminary Interested Investor.

**Bid Qualification Process**.   To be eligible to participate in the Auction, each offer, solicitation or proposal (each, a "Bid"), and each party submitting such a Bid, whether a single Bid for all or substantially all of the Purchased Assets or a joint Bid with another party each for separate components of the Purchased Assets (each, a "Bidder"), must be determined by the Debtors to satisfy each of the following conditions:

- Purchase Price Deposit:  Each Bid must be accompanied by a deposit by wire transfer in the amount equal to ten percent (10%) of the Bid to a non-interest-bearing account to be identified and established by the Debtors (the "Purchase Price Deposit").

- Terms:  A Bid must identify which assets the Bidder intends to purchase and include executed Transaction documents.  A Bid shall include a copy of the Form APA, including exhibits and schedules, marked to show all changes requested by the Bidder.  A Bid will not be considered as qualified for the Auction if (i) such Bid contains additional material representations and warranties, covenants, closing conditions, termination rights other than as may be included in the Form APA, unless such changes are approved by the Debtors in their sole discretion; (ii) such Bid is not received by the Debtors in writing on or prior to the Bid Deadline; or (iii) such Bid does not contain evidence that the Bidder has received unconditional debt and/or equity funding commitments (or has unrestricted and fully available cash) sufficient in the aggregate to finance the purchase contemplated thereby, including proof that the Purchase Price Deposit has been made.

- Corporate Authority:  The Bid must include written evidence reasonably acceptable to the Debtors demonstrating appropriate corporate authorization to consummate the proposed Transaction.

03/21/2019 SL1 1577122v14 006370.02031

- <u>Proof of Financial Ability to Perform</u>:   The Bid must include written evidence that the Debtors reasonably conclude demonstrates that the Bidder has the necessary financial ability to close the Transaction.

- <u>Contingencies</u>:  A Bid may not (i) contain representations and warranties, covenants, termination rights, financing, due diligence contingencies other than as may be included in the Form APA or (ii) be conditioned on obtaining financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy in all material respects of specified representations and warranties at the Closing.

- <u>Irrevocable</u>:  A Bid must be irrevocable through the Auction, <u>provided, however,</u> that if such Bid is accepted as the Successful Bid or a Backup Bid, such Bid shall continue to remain irrevocable, subject to the terms and conditions of the Bidding Procedures.

- <u>Bid Deadline</u>.  Regardless of when a party qualifies as a Preliminarily Interested Investor, the Notice Parties (as defined in the Bidding Procedures) must receive a Bid in writing, on or before May 15, 2019 at 5:00 p.m. (Prevailing Eastern Time) or such earlier date as may be agreed to by the Debtors (the "<u>Bid Deadline</u>").

- <u>Amount of Bid</u>.  Each Bid for all of the Purchased Assets shall clearly show the amount of the purchase price and shall be, separately or jointly with identified co-Bidders, in a minimum cash amount of $5,000,000.

- <u>Adequate Assurance of Future Performance</u>.  Each Bid shall be accompanied by adequate assurance of future performance information (the "<u>Adequate Assurance Information</u>"), including (i) information about the Bidder's financial condition, such as federal tax returns for the previous two years, a current financial statement, or bank account statements, (ii) information demonstrating (in the Debtors' reasonable business judgment) that the Bidder has the financial capacity to consummate the proposed Transaction, (iii) evidence that the Bidder has obtained authorization or approval from their board of directors (or comparable governing body) with respect to the submission of their Bid, (iv) the identity and exact name of the Bidder (including any equity holder or other financial backer if the Bidder is an entity formed for the purpose of consummating the proposed Transaction), and (v) such additional information regarding the Bidder as the Bidder may elect to include. By submitting a Bid, Bidders agree that, in the event the Debtors determine such Bid to be the Successful Bidder, the Debtors may disseminate their Adequate Assurance Information to those non-Debtors counterparties to Debtors' Contracts such Successful Bidder designates for assumption and assignment.

14

**Auction**.  If two or more Qualified Bids are received by the Bid Deadline, the Debtors will conduct an auction (the "Auction") to determine the highest or otherwise best Qualified Bid.  If only one Qualified Bid is received by the Bid Deadline, no Auction shall be conducted and the single Qualified Bid shall be deemed the Successful Bid. Only Qualified Bidders may participate in the Auction.

The Auction shall take place on May 17, 2019 at 10:00 a.m. (prevailing Eastern Time) at the offices of Stevens & Lee. P.C. 111 North Sixth Street Reading, PA, or such other place and time as the Debtors shall notify all Qualified Bidders, any official committee, and other parties invited to attend by the Debtors.

- Terms of Overbids.  An "Overbid" is any bid made at the Auction subsequent to the Debtors' announcement of an Auction Baseline Bid.  To submit an Overbid for purposes of this Auction, a Bidder must comply with the following conditions: Any Overbid after the Auction Baseline Bid shall be made initially in increments valued in an amount of $100,000 subject to modification of such increment by the Debtors at the Auction.  Additional consideration in excess of the amount set forth in an Auction Baseline Bid may include cash and/or noncash consideration.

- Backup Bidder.  Notwithstanding anything in the Bidding Procedures to the contrary, if an Auction is conducted, the party with the next highest or otherwise best Qualified Bid at the Auction, as determined by the Debtors, in the exercise of their business judgment will be designated as the backup bidder (the "Backup Bidder").  The Backup Bidder shall be required to keep their initial Bid (or if the Backup Bidder submitted one or more Overbids at the Auction, their final Overbid) (the "Backup Bid") open and irrevocable until the earlier of 12:00 p.m. (prevailing Eastern Time) on the date that is seventeen (17) days after the date of the Sale Approval Hearing (the "Outside Backup Date") or the closing of the Transaction with the Successful Bidder.  Following the Sale Approval Hearing, if the Successful Bidder fails to consummate an approved Transaction, because of a breach or failure to perform on the part of such Successful Bidder, the Debtors may designate the Backup Bidder to be the new Successful Bidder, and the Debtors will be authorized, but not required, to consummate the Transaction, with the Backup Bidder without further order of the Bankruptcy Court.  In such case, the defaulting Successful Bidder's Purchase Price Deposit shall be forfeited to Debtor Reading Eagle Company, and the Debtors specifically reserve the right to seek all available damages from the defaulting Successful Bidder.  The Purchase Price Deposit of the Backup Bidder shall be held by the Debtors until the earlier of 24 hours after (i) the closing of the Transaction with the Successful Bidder and (ii) the Outside Backup Date.

- Additional Procedures.    The Debtors may announce at the Auction additional procedural rules that are reasonable under the circumstances

(*e.g.*, the amount of time to make subsequent Overbids) for conducting the Auction.  Without limiting the foregoing, at any point during the Auction, the Debtors shall have the right to request additional financial information from any Qualified Bidder to allow the Debtors to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the Transactions contemplated by any Qualified Bid, as amended during the Auction process, and any further information that Debtors believe is reasonably necessary to clarify and evaluate the terms of a Qualified Bid.

- <u>Closing the Auction</u>.  The Auction shall continue until the Debtors determine in their reasonable business judgment that there is a highest or otherwise best Qualified Bid at the Auction for the Purchased Assets. The Auction shall not close unless and until all Bidders who have submitted Qualified Bids have been given a reasonable opportunity to submit an Overbid at the Auction to the then-existing Overbids and the Successful Bidder has submitted fully executed sale and transaction documents memorializing the terms of the Successful Bid.  Within one (1) business day following conclusion of the Auction, the Debtors shall file a notice on the Bankruptcy Court's docket identifying (with specificity) the Successful Bidder(s) for the Purchased Assets and any applicable Backup Bidders. The Debtors shall not consider any Bids submitted after the conclusion of the Auction and any and all such Bids shall be deemed untimely and shall under no circumstances constitute a Qualified Bid.

## C.    Assumption Procedures

35.    In connection with the Sale of the Purchased Assets, the Debtors intend to assume, pursuant to section 365(b) of the Bankruptcy Code, and assign to the Successful Bidder, pursuant to section 365(f) of the Bankruptcy Code, certain executory contracts and leases as of the Closing Date and to execute and deliver to the Successful Bidder, such documents or other instruments as may be necessary to assign and transfer such Executory Contracts and Leases. Accordingly, the Debtors propose the following assumption procedures (the "<u>Assumption Procedures</u>") with respect to the executory contracts and leases that may be designated by the Successful Bidder for assumption and assignment.

**<u>Assumption and Assignment Notice</u>**.    Attached to the Bidding Procedures Order as <u>Exhibit 3</u> is a notice of potential assumption and assignment (the "<u>Assumption and Assignment Notice</u>") of the Debtors' executory contracts and leases (the

"Debtors' Contracts").  On or before five (5) business days after the entry of the Bidding Procedures Order, the Debtors shall serve by first class mail or hand delivery the Assumption and Assignment Notice on all counterparties to the Debtors' Contracts.  The Assumption and Assignment Notice shall identify the Debtors' Contracts and provide the cure amounts that the Debtors believe must be paid to cure all prepetition defaults under the Debtors' Contracts (each a "Asserted Cure Amount" and, collectively, the "Asserted Cure Amounts").

**Objections**.  If a non-Debtor counterparty to any Debtors' Contract does not file and serve a Cure Objection by the Sale Objection Deadline, then such counterparty shall be (a) deemed to have waived all objections to assumption and assignment of the applicable Debtors' Contract, other than objections based on lack of adequate assurance of future performance, (b) forever barred from objecting to the Asserted Cure Amount and (c) forever barred and estopped from asserting or claiming against the Debtors, the Successful Bidder or any other assignee of such Debtors' Contract that any amount other than the Asserted Cure Amount is required to be paid to such non-Debtors counterparty to cure any defaults required to be cured as a condition of assumption of the applicable Debtors' Contract pursuant to Section 365(b)(1) of the Bankruptcy Code.

Promptly following the Debtors' selection of the Successful Bidder and the Backup Bidder, if any, at the conclusion of the Auction, the Debtors shall announce the Successful Bidder and the Backup Bidder, if any, and shall file with the Court a notice of the Successful Bidder and the Backup Bidder, if any.  Any objection by a counter-party to a Designated Contract based on the lack of adequate assurance of future performance (each an "Adequate Assurance Objection") must be filed on or before 5:00 p.m. (prevailing Eastern Time) on the day before the Sale Hearing Date (the "Adequate Assurance Objection Deadline") and served so as to be received the same day as the objection is filed, upon the Objection Notice Parties. If a non-Debtor counterparty to any Designated Contract does not file and serve an Adequate Assurance Objection by the Adequate Assurance Objection Deadline, then such counterparty shall be deemed to have consented to the assumption and assignment of such Designated Contract to the Successful Bidder.

D.    **Notice Procedures**

36.    On or before five (5) business days after entry of the Bidding Procedures Order, the Debtors will cause the Motion and the Sale Notice to be sent by first-class mail postage prepaid, to the following:  (a) all creditors or their counsel known to the Debtors to assert a lien (including any security interest), claim, right, interest or encumbrance of record against all or any portion of the Purchased Assets; (b) the Office of the United

States Trustee for the Eastern District of Pennsylvania; (c) counsel to the Official

Committee of Unsecured Creditors, if any; (d) all parties in interest who have requested

notice pursuant to Bankruptcy Rule 2002; (e) the Internal Revenue Service; (f) all

counterparties to contracts with either Debtor; and (g) all potential bidders previously

identified or otherwise known to the Debtors within the prior twelve (12) months.

37.     Within one (1) business day after the conclusion of the Auction, the

Debtors will file a notice identifying the Successful Bidder(s) and any Backup Bidder (the

"Notice of Successful Bidder") with the Court.

38.     The Debtors submit that the proposed Sale Notice and Notice of Successful

Bidder, and service of this Motion and the notice of the Auction and the Sale Approval

Hearing as described herein, complies fully with Bankruptcy Rule 2002 and the Local

Rules and constitutes good and adequate notice of the Sale and the proceedings with

respect thereto.  Therefore, the Debtors respectfully request that this Court approve the

form of the Sale Notice and the notice procedures proposed above.

## BASIS FOR RELIEF REQUESTED

**A.     The Sale is Within the Debtors' Sound Business Judgment and Should be Approved**

39.     Section 363(b) of the Bankruptcy Code provides, in relevant part, that a

Debtors, "after notice and a hearing, may use, sell, or lease, other than in the ordinary

course of business, property of the estate." 11 U.S.C. § 363(b)(1).

40.     Although section 363 of the Bankruptcy Code does not set forth a standard

for determining when a sale or disposition of property of the estate should be authorized,

courts in the Third Circuit generally authorize sales of a Debtors' assets if such sale is

based upon the sound business judgment of the Debtors.  *See, e.g., Meyers v. Martin (In re*

18

*Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991); *In re Antunes*, No. BR 15-16553-MDC, 2019 WL 913704, at *8 (Bankr. E.D. Pa. Feb. 19, 2019); *In re Scimeca Found., Inc.*, 497 B.R. 753, 771 (Bankr. E.D. Pa. 2013).

41.    The sale of estate assets outside the ordinary course of business is appropriate if: (a) there is a sound business purpose for the sale; (b) the Debtor has provided interested parties with adequate and reasonable notice; (c) the proposed sale prices is fair and reasonable; and (d) the purchaser has acted in good faith. *See, e.g., In re Abbotts Dairies*, 788 F.2d 143, 147 (3d Cir. 1986); *Antunes*, 2019 WL 913704, at *8; *Scimeca Found.,* 497 B.R. at 771. *In re Exaeris, Inc.*, 380 B.R. 741, 744 (Bankr. D. Del. 2008); *Titusville Country Club v. Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991).

42.    Debtors' showing of a sound business purpose need not be unduly exhaustive but, rather, Debtors are "simply required to justify the proposed disposition with sound business reasons." *In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984).  A sound business purpose for the sale of a Debtor's assets outside the ordinary course of business may be found where such a sale is necessary to preserve and enhance the value of the assets for the Debtors' estates, their creditors, or interest holders. *See, e.g., Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983); *Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) (stating that, in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand").

43.    Additionally, section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code. Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).  Provided that a bankruptcy court does not employ their equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of their section 105(a) power is proper.  *In re Fesco Plastics Corp.*, 996 F.2d 152, 154 (7th Cir. 1993); *Pincus v. Graduate Loan Ctr. (In re Pincus)*, 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002). Pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a Debtors' assets.  *See, e.g., Chinichian v. Campolongo (In re Chinichian)*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re Cooper Props. Liquidating Trust, Inc.*, 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws").

44.    The Debtors submit that sufficient business justifications exist to sell the Purchased Assets to the Successful Bidder, if any.  Any Successful Bidder APA will be extensively negotiated between the parties at arm's length and in good faith and confer several substantial benefits on the Debtors' estates that would not be available in the event of a liquidation of the Debtors' assets.

20

45.     The Sale Notice and other proposed notice procedures are designed to provide adequate notice to all potentially interested parties, including those who have previously expressed an interest in purchasing the Debtors' assets.  Accordingly, the Sale satisfies the second prong of the *Abbotts Dairies* standard.

46.     Moreover, the Bidding Procedures are designed to maximize the value received for the Assets.  Under the facts and circumstances of these Chapter 11 Cases, the process proposed herein by the Debtors allow for a timely and efficient auction process, while providing bidders and consultants with adequate time and information to submit a timely bid.  The Bidding Procedures are designed to ensure that the Purchased Assets will be sold for the highest or otherwise best possible purchase price under the circumstances. The Debtors are subjecting the value of the Purchased Assets to market testing through an auction process as set forth in the Bidding Procedures.  Therefore, the Debtors and all parties in interest can be assured that the consideration received for the Assets will be fair and reasonable, and therefore, the third prong of the *Abbotts Dairies* standard is satisfied. As discussed below, the "good faith" prong of the *Abbotts Dairies* standard is also satisfied here.

**B.      The Bidding Procedures Are Reasonable and Appropriate**

47.     Bankruptcy Code section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  The Debtors submit that the Bidding Procedures are appropriate, consistent with procedures routinely approved by courts in this district, ensure that the bidding process is fair and reasonable, and will yield the maximum value for their estates and creditors. The Bidding Procedures proposed herein are designed to maximize the value received for the Purchased Assets by facilitating a competitive bidding process in which all potential bidders are

03/21/2019 SL1 1577122v14 006370.02031

encouraged to participate and submit competing bids. The Bidding Procedures provide potential

bidders with sufficient notice and an opportunity to acquire information necessary to submit a

timely and informed bid. Thus, the Debtors and all parties in interest can be assured that the

consideration for the Purchased Assets will be fair and reasonable. At the same time, the Bidding

Procedures provide the Debtors with an adequate opportunity to consider all competing offers and

to select, in their reasonable business judgment, the highest and best offer(s) for the Purchased

Assets. Accordingly, the Debtors submit that the Court should approve the Bidding Procedures.

### C.    The Form of Sale Notice Is Appropriate

48.    The Debtors believe that their service of the Sale Notice and Motion, as

previously described herein, is reasonable and appropriate and satisfies any and all

requirements for such notice under the Bankruptcy Code, Bankruptcy Rules and Local

Rules.

49.    Under Bankruptcy Rules 2002(a) and (c), the Debtors are required to notify

creditors of the proposed sale of the Debtors' assets, including a disclosure of the time and

place of an auction, the terms and conditions of a sale, and the deadline for filing any

objections. The Debtors respectfully submit that the notice procedures described herein,

including, without limitation, the service of the Sale Notice, satisfy Bankruptcy Rule

2002, and are reasonably calculated to provide timely and adequate notice of the Sale to

all parties in interest in these Chapter 11 Cases, as well as to those parties which have

expressed an interest, or may express an interest, in bidding on the Assets.

### D.    The Sale of the Debtors' Assets Free and Clear of Claims, Liens, and Other Interests Is Authorized by Section 363(f) of the Bankruptcy Code

50.    Under section 363(f) of the Bankruptcy Code, a Debtor may sell property

"under subsection (b) and (c) free and clear of any interest in such property of an entity

other than the estate." In particular, section 363(f) authorizes a Debtor to sell property free

and clear if

    (1)       applicable nonbankruptcy law permit sale of such property free and clear of such interest;

    (2)       such entity consents;

    (3)       such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

    (4)       such interest is in bona fide dispute; or

    (5)       such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  Because section 363(f) is stated in the disjunctive, satisfaction of any

one of its five requirements will suffice to warrant approval of the proposed sale of the

Purchased Assets free and clear of all claims, liens, and other interests.  *See, e.g., In re

Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002); *see also Folger Adam

Sec., Inc. v. DeMatteis/MacGregor, JV*, 209 F.3d 252, 257 (3d Cir. 2000) (discussing how

section 363(f) authorizes the sale of a Debtors' assets free and clear of all liens, claims and

interests if "any one of [the] five prescribed conditions" is met).

      51.     Because the Debtors expect that they will satisfy, at minimum, the first,

second, third and fifth of these requirements, if not others as well, approving the Sale free

and clear of all claims, liens, and other interests (other than Permitted Encumbrances) is

warranted.  Furthermore, courts have held that they have the equitable power to authorize

sales free and clear of adverse interests that are not specifically covered by section 363(f).

*See, e.g., In re Trans World Airlines, Inc.*, 2001 WL 1820325 at *3, 6 (Bankr. D. Del.

Mar. 27, 2001); *Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White

Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987).

03/21/2019 SL1 1577122v14 006370.02031

52. Accordingly, the Debtors request that the Sale be approved free and clear of all claims, liens, and other interests (other than Permitted Encumbrances), with any such claims, liens, and other interests to attach to the net proceeds of the Sale in the order of their priority, with the same validity, force and effect that they now have against the Purchased Assets, subject, with respect to such net proceeds, to any rights, claims and defenses the Debtors or any parties in interest may possess with respect thereto.

**E.     The Successful Bidder Should Be Afforded All Protections Under Sections 363(m) and 363(n) of the Bankruptcy Code**

53. The Debtors request the Court to find that the Successful Bidder is entitled to the benefit and protections provided by section 363(m) of the Bankruptcy Code in connection with all aspects of the Sale.

54. Section 363(m) of the Bankruptcy Code provides, in pertinent part

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose their interest in the purchased assets, including any assumed and assigned unexpired leases and executory contracts, if the order allowing the sale is reversed on appeal. By its terms, section 363(m) of the Bankruptcy Code applies to sales of interests in tangible assets.

55. Although the Bankruptcy Code does not define "good faith purchaser," the Third Circuit has stated that a good faith purchaser is "one who purchases in 'good faith' and for 'value.'" *Abbotts Dairies*, 788 F.2d at 147. To constitute a lack of good faith, a party's conduct in connection with the sale usually must amount to "fraud, collusion

24

between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders." *Id.* (citing *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)); *see also In re Bedford Springs Hotel, Inc.*, 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); *In re Perona Bros., Inc.*, 186 B.R. 833, 839 (D. N.J. 1995).

56.     It is anticipated that any Successful Bidder will purchase the Purchased Assets in an arm's length negotiated transaction in which the Successful Bidder will have acted in good faith and without collusion or fraud of any kind, and the Debtors will present proof establishing as much at the Sale Approval Hearing for such Successful Bidder.  Accordingly, the Debtors request that the Court find that the Successful Bidder has purchased the Debtors' assets in good faith within the meaning of section 363(m) of the Bankruptcy Code.

**F.    The Proposed Assumption and Assignment of Certain Executory Contracts and Leases Should be Approved**

57.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a Debtor in possession, "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the Debtors." 11 U.S.C. § 365(a).  The standard governing bankruptcy court approval of a Debtor's decision to assume or reject an executory contract or unexpired lease is whether the Debtor's reasonable business judgment supports assumption or rejection.  *See, e.g., In re Trans World Airlines, Inc.*, 261 B.R. 103, 120 (Bankr. D. Del. 2001).  If the Debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract.  *See Grp. of Institutional Investors v. Chicago M. St. P. & P.R.R. Co.*, 318 U.S. 523 (1943); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39-40 (3d Cir. 1989). The business judgment test "requires only that the trustee [or Debtor in

03/21/2019 SL1 1577122v14 006370.02031

possession] demonstrate that [assumption or] rejection of the contract will benefit the estate." *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (internal quotation omitted). Any more exacting scrutiny would slow the administration of a Debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially. *See Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

58.    Pursuant to section 365(b)(1) of the Bankruptcy Code, for a Debtor to assume an executory contract, it must "cure, or provide adequate assurance that the Debtor will promptly cure," any default which is required to be cured, including compensating or providing adequate assurance of prompt compensation for any "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1).  The Debtors respectfully submit that the Assumption Procedures are appropriate and reasonably tailored to provide counterparties to the Debtors' Contracts with adequate notice of the proposed assumption and assignment of their contracts and leases, as well as proposed cure amounts, if any.   Such counterparties will then be given an opportunity to object to such cure amounts and assumption and assignment of their contracts and leases.   The Assumption Procedures further provide that, in the event an objection is not resolved, the Court will determine the disputed issues.  Accordingly, the Debtors submit that implementation of the Assumption Procedures is appropriate under the facts and circumstances of the Chapter 11 Cases and the proposed Sale.

59.    Once an executory contract is assumed, a Debtor in possession may elect to assign such contract.  *See In re Rickel Home Centers, Inc.*, 209 F.3d 291, 299 (3d Cir.

03/21/2019 SL1 1577122v14 006370.02031

2000) ("[t]he Code generally favors free assignability as a means to maximize the value of the Debtors' estates"); *see also In re Headquarters Dodge, Inc.*, 13 F.3d 674, 682 (3d Cir. 1994) (noting that the purpose of section 365(f) is to assist a trustee in realizing the full value of the Debtors' assets).  Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of future performance is provided." 11 U.S.C. § 365(f)(2).  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that Debtors will thrive and pay rent).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *Accord In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from Debtors has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

60.    Additionally, section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under title 11.  Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [title 11]." 11 U.S.C. § 105(a).  Provided that a bankruptcy court does not employ their equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of their section 105(a) power is

03/21/2019 SL1 1577122v14 006370.02031

proper. *See Fesco Plastics*, 996 F.2d at 154; *Pincus*, 280 B.R. at 312. Pursuant to section

105(a) of the Bankruptcy Code, a court may fashion an order or decree that helps preserve

or protect the value of a Debtor's assets. *See, e.g., Chinichian*, 784 F.2d at 1443 ("Section

105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to

the purposes of the Bankruptcy Code"); *Cooper Props.*, 61 B.R. at 537 (noting that

bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a

debtor may have in property for the benefit of its creditors as long as that protection is

implemented in a manner consistent with the bankruptcy laws").

61. The Debtors submit that the assumption and assignment of such Debtors'

Contracts to the Successful Bidder, as of the Closing Date, is necessary to the

consummation of the Sale and is well within the Debtors' sound business judgment. The

Debtors' Contracts selected by the Successful Bidder are necessary to run the Debtors'

business, and as such, they are essential to inducing the highest or otherwise best offer for

the Purchased Assets. It is unlikely that any purchaser would want to acquire any

company on a going-concern basis unless a significant number of the contracts and leases

needed to conduct the business and manage the day-to-day operations are included in the

transaction. Counterparties to the Debtors' Contracts will be provided with an

Assumption and Assignment Notice and will have an opportunity to object to the potential

assumption and assignment of their contracts and leases prior to the entry of the Sale

Approval Order. The Debtors propose that any counterparty that fails to object to the

proposed assumption and assignment of their respective Debtors' Contract will be deemed

to consent to that assumption and assignment pursuant to section 365 of the Bankruptcy

Code on the terms set forth in the proposed Bidding Procedures and Sale Approval Order,

and to the cure amounts identified in the Assumption and Assignment Notice. *See, e.g., In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (holding that creditor was deemed to have consented to sale by not objecting to sale motion).

62.    Accordingly, the Debtors submit that the assumption and assignment to the Successful Bidder of certain of the Debtors' Contracts should be approved as an exercise of the Debtors' sound business judgment.

## REQUEST FOR WAIVER OF BANKRUPTCY RULES 6004(h) AND 6006(d)

63.    Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). Similarly, Bankruptcy Rule 6006(d) provides that "[a]n order authorizing the [Debtor] to assign an executory contract or unexpired . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d).

64.    The Debtors submit that cause exists to justify a waiver of the fourteen (14) day stays under Bankruptcy Rules 6004(h) and 6006(d), as promptly closing the Sale is of critical importance. The Debtors therefore request that the Sale Approval Order be effective immediately by providing that the fourteen (14) day stays under Bankruptcy Rules 6004(h) and 6006(d) be waived.

03/21/2019 SL1 1577122v14 006370.02031

## RESERVATION OF RIGHTS

65.    Nothing contained herein is intended, or should be construed, as an admission of the validity of any claim against the Debtors or a waiver of the Debtors' rights to dispute any claim.  Nothing contained herein is intended, or should be construed, as an approval, assumption, or rejection of any agreement, contract, or lease under section 365 of the Bankruptcy Code.

## NOTICE

66.    The Debtors have provided or will provide notice of this Motion to (a) the Office of the United States Trustee for the Eastern District of Pennsylvania; (b) the Commonwealth of Pennsylvania Department of Revenue; (c) all local taxing authorities; (d) the Internal Revenue Service; (e) the entities listed on the Consolidated List of Creditors Holding the 20 Largest Unsecured Claims filed by the Debtors pursuant to Bankruptcy Rule 1007(d); (f) the Federal Communications Commission; (g) the banks in which the Debtors maintain their bank accounts; (h) representatives of the secured creditors believed to be claiming an interest in the cash collateral; (i) counsel for the proposed DIP Lender; and (j) all parties who, as of the filing of this Motion, have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter the Bidding Procedures Order and the Sale Approval Order, granting the relief requested herein and such other and further relief as the Court may deem just and proper.

[*Signature Page Follows*]

03/21/2019 SL1 1577122v14 006370.02031

Dated:  March 22, 2019                    **STEVENS & LEE, P.C.**

By:   /s/ Robert Lapowsky
Robert Lapowsky
Evan Coren
620 Freedom Business Center, Suite 200
King of Prussia, PA 19406
Telephone: (215) 751-2866
Facsimile: (610) 371-7958
rl@stevenslee.com
ebc@stevenslee.com

*Proposed Attorneys for the Debtors and
Debtors in Possession*